David L. Ross. Good afternoon, Your Honor. This case presents two very, I believe, critical and important issues. The first issue is understanding the difference between quorum novus and habeas. It seems that the courts below are confused as to when to use a quorum novus, when to the only remedy available was a quorum novus. And in this sense the judge – But Judge Wilson recognized that. He did. But he also still insisted that the reason he didn't want to grant the quorum novus is because he believed that the appellant should have filed a habeas previously. And in this particular instance, that was impossible for two reasons. One, you can't file a habeas until you exhaust administrative remedies. And he was in immigration proceedings. The only reason to file the habeas would have been to get out of immigration custody. He couldn't file a habeas because he had to exhaust his administrative remedies first. Otherwise, the habeas would have been denied. Well, this was a Federal conviction, so the proper procedure is a motion under 2255 to set aside the judgment. If he were going to argue that this was a criminal proceeding. And that's where the misunderstanding at the lower court took place. This was really an immigration proceeding, not a criminal proceeding. No, but he wanted to set aside his conviction in the criminal case. That's correct. So one of the ways he could have done that was to file a motion under 2255, which is – that occurs in a Federal case, which is basically equivalent to a habeas petition under 2254 in a State proceeding. Right. But in this particular instance, what really occurred, we have to look at the context of what was happening. In a theoretical sense, it's different than when you look at the context. In the context of this case, you have a man who is in immigration custody. He has not yet been charged. But now wait a minute. He's in prison for this felony, is he not? Well, his term is over. He's now in Eloy, which is a transitional – I thought he was sentenced for a year. That's correct. And does the year expire? The year expires, and he's now in immigration proceedings. Now, wait a minute. But while he's – before he gets to the immigration proceeding, he's in a Federal prison, having been convicted of this felony. And he learns that the consequence is he will be deported. Well, he doesn't learn that while he's in for his criminal conviction. He learns that while he's in. He doesn't? I thought he got a notice from the INS. Why is it? He gets a notice from the immigration that he has to go to a deportation proceeding, but that doesn't mean he – Well, doesn't he immediately ask somebody, what's this mean? And it's obvious. The consequence is deportation. Well, he knew that there would be a deportation proceeding, but he was told by his attorney he would not be deported. Well, now, he was told that before the law changed. You're not suggesting his lawyer told him that when he – after he got the notice, are you? Well, he didn't really have a lawyer at the time that he got the notice. Oh, wait a minute. He gets an immigration lawyer. That's correct. All right. And the immigration lawyer tells him, you will be deported. But this is after his time served for the crime is over. I don't – I think your chronology is very unlikely. He's in prison, in Federal prison. He's told, you're going to have to – a notice of deportation. You mean to say he's innocent at that point of what the consequence is? Well, I don't – I don't know that the word innocent – I mean, I understand what you're saying. Well, he doesn't know that he's going to be deported? He knows he's going to be. The law is very clear. Well, he knows that. You commit a felony like this, you're deportable. Right. But first of all, he doesn't know that that's the law. Well, secondly, he must ask somebody, all right, what does this mean? And the man, presumably either his old criminal lawyer or his new immigration lawyer says, you may be deported. Well, if I may, Your Honor, if I may give you the facts of what happened. What happened is he was serving his time for his criminal conviction. They had a program where you serve your time for your criminal conviction, then you immediately go to immigration proceedings, and they do it in the same prison. So he was serving time in Eloy, and then he – But he was in federal custody as a criminal. That's correct. It was not an immigration proceeding. That's correct. And what happens is they keep you in the same institution, and then in that institution, they actually have a courtroom. He then goes to court. He's charged with being a deportable alien. He wins – Well, what month of the sentence is that? I'm sorry, Your Honor? What month of his sentence did that occur? His sentence was over. He had already served his time. Well, if I remember the record correctly, it's about the seventh month of his sentence he's told you're going to be deported. He's told you're going to go to a deportation proceeding, which he already knew would have occurred. Well, am I right? It was about the seventh month of his sentence. Seventh or eighth month. That's correct. He could have brought the proceedings, set aside his sentence then. Well, he didn't know he was actually going to be deported. That's the whole point of this case. Well, didn't he talk to a lawyer? He won his case. He actually won his case. But didn't he talk to a lawyer? Yes, he did. All right. But didn't the lawyer tell him it's extremely likely that you'll be deported? Actually, Your Honor, the lawyer told him that he would not be deported because he told him that his crime would not constitute an aggravated felony since he was charged under a fraud statute. What happened was, and this is critical to this case, there are three ways that you can be found to be an aggravated felon, which would cause him to be deported. One is if he was charged under the fraud statute, which is 101A43, I think it's M. The other one is forgery. And the third one was theft. What happened is the government only charged him under fraud and forgery. And his attorney explained to him that under the fraud and forgery statutes that create an aggravated felony, he would not be deported. And that's exactly what happened. He won his case in front of the immigration judge, and the judge ruled he was not deportable. What happened was, after he was released from custody and he finished his sentence, everything was over, the government revisited the case and decided that they would charge him under a theft immigration statute. And that's what created the aggravated felony. And at that time... Had he been convicted of grand theft? No, he was convicted of embezzlement, which the government claimed was akin to a theft statute. But the first immigration judge found that it did not qualify under an aggravated felony. The second immigration judge, however, found that he was indeed an aggravated felon. It was at that point in time that he realized that he had to do a quorum novis. He was no longer in custody. He didn't have any restrictions on his freedom. And it was at that point in time that he filed a quorum novis. And even the judge in the district court recognized that that's why the quorum novis would have been appropriate, but for the fact that he should have filed a habeas previously. But there was no reason to do a habeas previously, because he had actually won the case. But, counsel, I'm puzzled with why the government could charge him again. They did not appeal the first holding of the immigration judge. That's correct. That should have been the end of the story. Unfortunately, until this court changes the law, which it will have an opportunity in about three to five months, I believe, the law is right now that the government can revisit on a notice to appear at any time, and there's no res judicata if they find another basis for removing an individual. And that's unfortunately the law. But it was the same crime. There's no other basis. I'm totally in agreement with you, Your Honor. And from my perspective. Is his administrative, the INS, proceedings, is that pending before the BIA? That is now actually, it's pending before the Ninth Circuit. And if you'd like, I can give the case number for that, too, if Your Honor would care to have that. It's just for the record, it's 0470883. Say, give that number again. Okay, Your Honor. Let me just put my glasses on. I'm at that age in life. It's 0470883. Before you exhaust all your time, could you address the prejudice prong? Yes. I believe to be. And actually, what relief are you, what is the, if we were to agree with you, what is the ultimate relief you're seeking? Well, in this case. Prejudice and relief. Okay. Relief, number one, would be, in the best possible way, would be that the court reverses the district court and grants the quorum novice and allows him to have a sentence that's two days less. In a less perfect relief. How can we tell the district court, you've got to impose a sentence two days less? Would it just go back to the district court for resentencing? That's correct. Send it back to the district court for resentencing with an order saying, change the sentence to 364 days instead of 366 days. My problem with that is that immigration consequences are not a basis for departure. There is a case, Your Honor, and let me, just so I don't mispronounce the name of the case, it's Charikoubios. C-H-A-R-R-Y hyphen C-U-B-I-L-L-O-S, and it's 91, Fed Third, 1342, and it does say that actually deportation consequences can be a basis for downward departure. That's a little bit different, though. Over there it was, you know, in the prison system, if you're not a U.S. citizen, you don't get to take advantage of an early release. That case dealt with a situation where the district court judge wanted to depart downward a little bit to account for the fact that the alien would have to spend more time in custody as opposed to somebody who's not an alien. And the district court, and the Ninth Circuit said that's, you know, under unique circumstances the district court can't depart. But there's another case which I think tends to support what Judge Fletcher was just saying, and that's, I think it's Alvarez-Cardenas, a 1990 case where we said that the threat or the possibility of deportation cannot be a basis for a downward departure, which is what he's looking for here. Well, that is the mechanism, but in reality he could have been sentenced to 364 days. What happened here in this case, which was so unbelievable, is that his attorney argued for a longer sentence. Well, at the district court level, if you were involved in sentencing, you would know that we often, as district court judges, gave a sentence of 12 months and one day because they get to take advantage of the good time credits in prison to get out. If you don't give them more than one year, they don't get to take, the prisoners do not get to take advantage of the good time credit. They have to serve their full time. So here if you had given him, if the district court had given him 11 months and 28 days, he would have had to serve 11 months and 28 days. Instead he got 12, well, I mean, but 12 months and one day he got out, you know, a little bit, a month and a half earlier. But, you see, the presumption, there is a presumption, which is, in my understanding of the situation, is not correct, and that is that the judge could not have given him less than a year. Actually, the judge could have given him less than a year. The attorney did not argue for the judge to give him less than a year, but it was within the parameters of the sentencing guideline to get less than a year. Could we say there was a reasonable probability here that he would have gone to trial? Well, that's the second question that you asked before, and let me just address that. The Hirabayashi, and I hope I'm pronouncing that case correctly, really is silent, and that's the only case in this circuit that even deals with probability of outcome. There is actually no case in this circuit that says that you need to show probability of outcome. Hirabayashi actually kind of suggests that you don't need probability of outcome. What do we have here? We have a case where the district court recognizes that the attorney committed malpractice, and yet comes to the conclusion that he still probably would not have gotten the relief he sought because the judge says, I wouldn't have given a downward departure. Well, two things occur there. Number one, the judge didn't know that he could actually give him a lower sentence, and number two, if the attorney for the appellant, the criminal attorney, would have just said to the U.S. attorney, listen, I need 364 days. That's part of the plea agreement. He would have got it. So all of those things didn't occur, and the judge at the district court level didn't have that information, the non-opposition of the assistant U.S. attorney that might have occurred, the fact that he would have, the attorney would have argued. So therefore, it's really not possible for a district court judge to say, in hindsight, I wouldn't have granted that relief anyway because at the very minimum, he should have a hearing on the whole issue and let oral argument take place, let briefs be submitted, and at that point in time, the judge can make up his mind whether or not he would have given a lower sentence. But he foreclosed that possibility. Are there any permissible grounds for downward departure that could be advanced? That is a question that we've researched, and we've come to the conclusion that he could have gotten a 5K1 because of his participation and the fact that he gave information to the government about what had occurred. So, yes, it is our belief that he could have had a downward departure under a 5K1. 5K1 requires the government to make a motion to depart downward for substantial assistance. And that's precisely the point, is that a criminal attorney didn't talk to the government about that because the criminal attorney, in his ignorance of the law, believed that that was not in the client's best interest. In fact, that's what he should have done. He should have talked to the AUSA and said, listen, because of his information and participation, he should have gotten a 5K1. But because he didn't do that, we don't know what would have happened. Thank you. You've gone way over your time. I apologize. That's fine. We'll hear from the government. May it please the Court. John Owens for the United States. I'd like to begin by recounting the chronology in this case, because it seems there might be a little confusion as to what exactly occurred and who was where when. The defendant pled guilty in July of 1996. And during his change of plea in hearing, the defendant stated that he understood that he could be deported. There was a change in the law in September of 1996. The defendant was sentenced in December of 1996. Now, while the defendant was in Bureau of Prison's custody, which is basically the year of 1997, he twice received notice from the INS regarding his immigration status. And I would direct the Court, it was in May of 1997 and again in August of 1997, and I would direct the Court to the government's excerpts of record at pages 31 and 32, which are the two notices that the defendant received while in custody, and especially the one that he received in August of 1997, which I believe Judge Newman was referring to as the seventh or eighth month. That one says that one of the reasons for deportation is that he received a sentence of a year and a day. Now, at that time, the defendant could have filed a Section 2255 motion. He did not. Apparently, he had advice from counsel that the offense as to which he'd been convicted would not make him deportable. And that appeared to be correct because the immigration judge said, yeah, that's right, you can't be deported based on this. So why should he at that time have thought that he needed to file a habeas petition? Well, his original trial counsel, Mr. Nutter, apparently advised him of this, and that's what he, when he pled guilty and was sentenced, that's what he believed. But also his immigration judge and immigration lawyer told him that and said, I'll get you off, and he did. Well, Your Honor, there's nothing in the record to support that. In fact, this court actually struck much of the record in this case because none of this was before the district court. I actually, Your Honor, have no idea what his immigration attorney told him, and frankly, this court has no record of what he told him in this case. Perhaps we can judge by results. The immigration judge ruled that he was not deportable. Apparently initially... And the government did not appeal. Apparently that's what initially would happen, Your Honor, but then later on, in fact, he was found to be deportable. Yeah, but... So, again... At the time, his judgment was correct. Well, Your Honor, I guess I don't want to be asking the court questions, but at what time were you focusing on? In 1997, he received these two notices. When he's released from prison or from the BOP sentence, he then has three years of supervised release, which as the Ninth Circuit has held, supervised release is a form of custody. He then had another three years to file a 2255 motion. So while this immigration litigation was... When did his supervised release end? It was a three-year term. When did it end? Would have been approximately in December of 2000. So he had all of this time to file a 2255 motion. While his immigration attorney knew that these convictions were going to be very problematic for him. Well, until he was given notice the second time, it seems to me he didn't have any reason to think there was a problem. Well, the second time... When you refer to the second time, you're not referring to the August 1997 second time. You're referring to the second immigration litigation. So more like the fourth or the fifth or the sixth time he was told that this conviction and the length of sentence would provide a problem to him. He had all of this time to file a 2255. And he didn't. He decided to go down a different path. And it was not until June of 2002 until he filed this writ of cordon novus in this case. You don't claim that you're prejudiced, do you? Well, Your Honor... The government. I didn't see that in your briefs. Well, Your Honor, I would point this. The defendant today has suggested that he's eligible for a 5K1.1. Frankly, I have no idea what the... But you didn't argue prejudice in your briefs. That's true, Your Honor. You didn't argue it to the district court, as I recall. That's true, Your Honor. We did not. But then again, when he raises new issues today about 5K1.1, the playing field has changed. If he's suggesting now that he's entitled to a 5K1.1, I have no way to address that at this point today. In that case, Your Honor, there would be prejudice. Well, that's something you can argue to the district court. Well, I don't think that's necessary, Your Honor. I think the case should end now. And here's why. The writ of cordon novus is an extraordinary remedy. And the Ninth Circuit has said it only is there to cure the most fundamental errors. And to receive writ of cordon novus relief, the defendant has to show four things. First, that the usual remedy was not available. Second, that there was a valid reason for the delay. Third, there's an actual case of controversy. And fourth, it does actually prejudice to the defendant. Now, first, as to the usual valid reasons for the delay, I submit there simply aren't any. And I would direct... The district court disagreed with you on that, though. No, the district court actually found there was no valid reason for a delay. No, but I mean on the... Oh, I'm sorry. Well, if you get to the first prong, though... The first prong in terms of the usual remedy. And on that point... The district court said that this was a proper remedy. Correct. And on that point, as we pointed out in the briefs, we actually disagree with the district court on that issue because we feel the usual remedy is a 2055, which was available to the defendant for three, four years in this case. But be that as it may, we don't believe there's a valid reason for the delay in this case. I would point this Court to the... I hope I'm pronouncing this correctly. The Magee decision, M-A-G-E-H-E. We talked about it in the briefs. We talked about this very issue. I also point the Court to the Martinez decision, which is a district court opinion, which addressed this issue as well. In terms of the prejudice, Your Honor... But, you know, as I understand the unreasonable delay, it's more analogous. The standard we look to is a laches kind of standard, which implies some sort of prejudice. Well, Your Honor, there is one case, the Telnick decision, which has some language regarding laches. But all... It's not an exact laches standard, but it's like laches. I mean, it's looking to see... That's true, Your Honor. ...if there's some prejudice to you. And, Your Honor, if we... And if this had been raised by the defendant in the district court on this point, I think the government could demonstrate prejudice. For example, if we have to go to a resentencing in this case, we want to put on vixen to testify how this forgery by the defendant of over $100,000 hurt them, it's a lot harder to do that in 2005 or 2006, whenever this occurs, as opposed to 1996. So I think there is actually real prejudice to the government in this case. But in terms of prejudice... That's not in the record. It is not in the record. That's correct, Your Honor. But in terms of what the prejudice to the defendant is, the record is very clear on that point. In this case, Judge Wilson, who looked at this case in 1996, described the defendant's conduct as egregious. Egregious. Judge Wilson was not inclined to grant a downward departure in this case. Well, he sentenced him to the low end of the guideline range and was accommodating enough to give him the one extra day. That is true, Your Honor. But I would also point out that the low end of the range was negotiated by the parties as part of the plea agreement. And most judges, as you know from the central district, used to go with the parties' plea agreement when they recommend a low end. But as to the prejudice, Judge Wilson said, reviewing the case again in 2002 and in 2003, that he was not inclined to grant a downward departure. He found the defendant's conduct to be egregious. Why was the defendant deserving of a downward departure? The fact is the defendant doesn't like the fact he's going to be deported. I appreciate that. But that's why you don't commit forgery of over $100,000 in this case. One thing I think is very important for this Court to recognize is that had the defendant raised this claim back in 1996, and Judge Wilson had exercised his discretion and denied it, this Court would not be able to review that issue. So I think that the whole issue of that departure ground could not review it because you can't review discretionary reusals of downward depart. So when this Court reviews the question of prejudice, I think this Court should be very, very leery of reversing Judge Wilson on that question. Well, do you think if he had known, if he had known, if he had been properly advised at the time of the sentence, after he'd entered his plea, when there was that, between that three-month period or two-month period that IRIRA passed, which made it substantially likely or, you know, virtually certain that he would, he could be, would be deported, which was different than when he entered his, when he entered the plea agreement. That's right. But do you think if he had known that, that it would, you know, what's there to lose? I might as well go to trial. Well, he could spend a lot more time in custody, for one thing. What's there to lose? Well, I mean, you know, you're going to be deported or you're going to spend a little more, you know, spend a little more time in jail. Well, it's one thing to spend one year in jail and be deported and then spending maybe three, four, five years in jail and then being deported. There is a reason why you would not go to trial in this case. But this is all the more questions why, Your Honor, when we're litigating this case now in 2004 and so forth, why there's the prejudice. A lot of these questions that you're asking the government now, if we have to go back and do this all again before Judge Wilson, we're not in the same position we were in 1996, and that's the prejudice. Well, but, you know, the whole basis of Coronobus here is that he was denied a fundamental right. And his fundamental right here is effective assistance of counsel. Well, it's only to meet the standards. He has to meet the standards, deficient performance. Judge Wilson said, yes, there was deficient performance here. But then he has to meet the standard of prejudice. And that's kind of what we're all debating here. Correct, Your Honor. I mean, the defendant has a right. And there it's reasonable probability. Correct. Under Strickland, which I think is the standard that would apply here, although you could even argue it's a heightened Strickland standard because we are eight years removed, the defendant has to show not only that Mr. Nutter made a mistake, a mistake that actually ended up saving the defendant 30, 40 days in prison because he was able to earn good time credit, but also has to be a mistake that mattered. And I would submit that Judge Wilson is the best person to analyze whether it would have mattered or not. He analyzed this record, described the defendant's conduct as egregious, and didn't think a downward departure was appropriate. And considering he had actually made that back in 1996, this Court couldn't review that decision. So unless the panel has any further questions, I would just remind the Court. I couldn't tell from the briefs. What were the basis for the departure requests that were made? Your Honor, I actually don't know. We didn't get a copy. The pre-sentence report was not part of this. And, Your Honor, I actually don't know. Do you know what the basis? I actually don't know what the basis are, the grounds for the downward departure. I know there was more than one. Did anybody attempt to see if there was a copy of the sentencing transcript? Well, the sentencing transcript has been included. Oh, that's great. And the way that Judge Wilson described it is he said, I'm denying the downward departures, and I'm doing so based on the government filing in April of 1996 or some earlier time that year. And we don't have that. That is not part of the excerpt of record in this case. So I know there was more than one requested because he refers to it in the plural, but as to what they were, I don't know what they were. I see that I am out of time. I would just like to ask the Court to please affirm the judgment of Judge Wilson. Thank you. You have about 30 seconds. But there's something you just must say. I must say. All right. Say it. One thing, the government never raised prejudice. Today is the first day they're raising the issue of prejudice, not in any brief at the district court level, in their appellate brief, at all. Number two, he was under supervised release, but not when the second immigration proceeding took place. When that took place, his supervised release was over. That's it. Thank you. Thank you. Appreciate your arguments. The matter will be submitted.
judges: B. Fletcher, Noonan, Paez